UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SUSAN LAURA ERB,

    Plaintiff,

v.

ANDREW SAUL,[1] Commissioner of Social Security,

    Defendant.

No. 1:18-cv-01398-GSA

**ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF COMMISSIONER OF SOCIAL SECURITY AND AGAINST PLAINTIFF**

### I.    Introduction

Plaintiff Susan Laura Erb ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability insurance benefits pursuant to Title II of the Social Security Act. The matter is currently before the Court on the parties' briefs which were submitted without oral argument to the Honorable Gary S. Austin, United States Magistrate Judge.[2] *See* Docs. 13, 17 and 18. Having reviewed the record as a whole, the Court finds that the ALJ's decision is supported by substantial evidence and applicable law. Accordingly, Plaintiff's appeal is denied.

///

---

[1] Commissioner of Social Security Andrew Saul is substituted as Defendant pursuant to Fed. R. Civ. P. 25(d). *See also* Section 205(g) of the Social Security Act, 42 USC 405(g) (action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

[2] The parties consented to the jurisdiction of the United States Magistrate Judge. *See* Docs. 7 and 8.

1

## II. Procedural Background

On November 13, 2014, Plaintiff filed an application for disability insurance benefits alleging disability beginning June 28, 2011.[3] AR 17. The Commissioner denied the application initially on June 3, 2015 and on reconsideration on September 29, 2015. AR 17, 84-85.

On October 13, 2015, the Commissioner issued a targeted denial review, finding insufficient evidence to accurately assess Plaintiff's mental impairment(s). AR 304-08. The state agency was also directed to resolve several inconsistencies concerning Plaintiff's medical treatment and work history. AR 304-08. Following the second reconsideration, the Commissioner again denied the application on December 11, 2015. AR 104-05. Plaintiff's last insured date was December 31, 2015. AR 19.

On January 14, 2016, Plaintiff filed a request for a hearing before an Administrative Law Judge. AR 17. Administrative Law Judge Sharon L. Madsen presided over an administrative hearing on September 5, 2017. AR 34-55. Plaintiff appeared and was represented by an attorney. AR 34. On April 25, 2018, the ALJ denied Plaintiff's application. AR 17-26.

The Appeals Council denied review on August 6, 2018. AR 3-7. On October 10, 2018, Plaintiff filed a complaint in this Court. Doc. 1.

## III. Factual Background

### A. Plaintiff's Testimony

#### 1. Agency Hearing

Plaintiff (born April 29, 1956) lived with her husband, who supported them both. AR 39-40. Plaintiff was able to drive during the day. AR 40. She had completed high school and some college courses. AR 40.

Plaintiff was able to perform her own personal care. AR 40. She did household chores such as laundry and dishwashing. AR 40. She shopped for groceries with her husband. AR 41. Because her husband worked long hours her cooking consisted of making sandwiches. AR 41.

On her good days Plaintiff got up, drank coffee, watered her flowers and walked to the

---

[3] Plaintiff filed a prior application for disability insurance benefits on July 6, 2011. AR 17. The application was denied at the initial level on August 23, 2011. AR 17. The ALJ found no basis to reopen the prior determination. AR 17. Plaintiff also filed applications in 2000, which the Commissioner also denied.

mailbox. AR 41. On bad days, Plaintiff's pain was severe and she stayed in bed. AR 41. In a typical week Plaintiff had four good days and three bad days. AR 42.

Plaintiff last worked as a real estate sales person. AR 42. She had also previously worked as the office administrator for the Interventional Pain Center, and as a medical assistant. AR 42. In 2011, Plaintiff took a second job at Walmart attempting to earn enough money to save the family's home from foreclosure. AR 43. After about ten months, Plaintiff had a stroke and was not allowed to return to Walmart. AR 43.

After suffering two strokes Plaintiff had peripheral neuropathy in her hands and feet, which caused constant tingling and burning and occasional numbness. AR 44. She had fibromyalgia "all over." AR 45. Four or five times daily, Plaintiff experienced fibromyalgia flares that caused uncontrollable burning and stabbing pain. AR 46. Her doctor prescribed Norco, which provided little relief.[4] AR 46. Plaintiff took Xanax for panic attacks and depression. AR 50-51. Plaintiff also used cooling sunburn sprays. AR 46.

Plaintiff's vision was only good in a dark room; otherwise, she required glasses. AR 47. She needed a knee replacement but "the surgeon d[id] not want to do it." AR 47. Plaintiff also had right ankle pain and had recently broken a foot bone for no apparent reason. AR 47. She had suffered daily migraine headaches since she had a hysterectomy when she was 24 years old. AR 47-48. Plaintiff had irritable bowel syndrome and vaginal pain. AR 48. She had constant ringing in her ears that sometimes triggered severe jaw and neck pain. AR 49.

Plaintiff could lift five pounds, stand for about ten minutes, walk about one-half block and sit for about ten minutes. AR 50. She was unable to bend over or squat to pick a dropped object up from the floor. AR 50. She climbed stairs with difficulty. AR 50.

### 2. Adult Function Report

#### a. September 16, 2011

Plaintiff's adult function report was generally consistent with her testimony. Her responses clarified that Plaintiff took the pain medication to relieve her ear pain and needed to

---

[4] Norco (hydrocodone and acetaminophen) is a narcotic pain reliever prescribed for moderate-to-severe pain. www.medlineplus.gov/druginfo/meds/a601006.html (accessed November 19, 2019).

nap after her flare-ups. AR 248. Her ear pain sometimes awakened her. AR 249. Her impairments affected her ability to lift, squat, bend, stand, reach, walk, kneel, talk, hear, climb stairs, see, remember, complete tasks, concentrate and get along with others. AR 245.

Plaintiff could make sandwiches or microwavable meals. AR 250. If she was dizzy or nauseous, however, she did not eat. AR 250. Her household chores included sweeping, laundry, dusting, and watering outside plants. AR 250. Plaintiff was able to drive and go out alone. AR 251. She shopped for groceries and medicine. AR 251. Plaintiff was afraid of leaving the house in case she would have a flare-up while she was out. AR 254.

### b. November 1, 2015

Plaintiff reported all-over body pain that rendered her unable to sit, stand or concentrate. AR 309. She spent most days on the couch watching television. AR 310. On days when her pain was somewhat controlled, she washed clothes, watered flowers and tried to clean. AR 310. She continued to prepare only simple meals. AR 311. Plaintiff had sold her horse because she could no longer care for it. AR 313.

Plaintiff now drove only during daylight hours. AR 312. Depending on her pain, her husband sometimes accompanied her shopping. AR 312. Her impairments now affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, hear, climb stairs, see, remember, complete tasks, concentrate, understand, follow instructions, use her hands and get along with others. AR 314. About six months earlier, she had begun to experience panic attacks. AR 315.

### B. Third-Party Evidence

Plaintiff's husband, Samuel Erb, submitted Third-Party Adult Function Reports on July 18, 2011 and again on November 1, 2015. AR 240-47, 318-25. Mr. Erb's responses were generally the same as those of his wife. On both forms, Mr. Erb opined that Plaintiff was no longer able to work outside their home. AR 241, 318.

///
///
///
///

### C. Medical Records[5]

On July 4, 2009, Plaintiff was treated for headache and possible cerebrovascular accident in the emergency room of Mercy Medical Center. AR 394. Magnetic resonance imaging revealed "subtle changes in the left posterosuperior cerebral hemisphere, suggestive of an acute or subacute infarct," but no hemorrhage or other abnormality. AR 394.

On May 10, 2011, Plaintiff saw Donald Carter, M.D., an ear, nose and throat specialist, reporting five months of ear pain. AR 393. Dr. Carter cleaned Plaintiff's left ear and recommended a low salt diet with no caffeine, and cessation of smoking. AR 393.

On June 13, 2011, Plaintiff reported ear fullness and dizziness even though she had begun a low salt diet and stopped consuming caffeine. AR 389. Suspecting Meniere's Disease, Dr. Carter sent Plaintiff for magnetic resonance imaging to rule out other possible causes of hearing and balance problems. AR 389.

On July 5, 2011, Dr. Carter treated Plaintiff following an episode of vertigo. AR 384. Dr. Carter's examination revealed that Plaintiff's ears, nose and throat were normal except for slightly enlarged tonsils. AR 384. Her temporomandibular joint "seem[ed] OK." AR 384. Hearing was fairly stable bilaterally. AR 384.

On September 21, 2011, Joann Garcia, FNPC, examined Plaintiff, who was experiencing right ankle pain described as constant, severe, sharp, dull, throbbing, aching and hurting. AR 396. Plaintiff previously had right tarsal tunnel surgery in July 2010 with post-operative wound complications. AR 396. Plaintiff stated that her current pain was different in that her ankle sometimes became warm and she could not tolerate closed shoes or contact. AR 396. Following discussion of treatment options with Plaintiff, Ms. Garcia prescribed Lyrica and physical therapy. AR 399.

On November 26, 2013, Plaintiff saw otolaryngologist Mark S. Spitzer, D.O., for left ear pain, previously diagnosed as Meniere's disease. AR 413. Plaintiff reported intermittent pressure, ringing, dizziness and nausea lasting hours to days. AR 413.

---

[5] Objective medical evidence in the administrative record does not include records of any treatment for several of the impairments reported by Plaintiff. The record includes notes from medical treatment provided after Plaintiff's last insured date of December 31, 2015, which are not discussed here.

Magnetic resonance imaging on January 2, 2014, revealed (1) encephalomalacia left parieto-occipital lobes as noted in previous studies; (2) abnormalities of the frontal, ethmoid, sphenoid and maxillary sinuses; and, (3) no IAC neoplasm or acoustic neuroma. AR 407. Dr. Spitz diagnosed chronic maxillary sinusitis (473.0); chronic ethmoidal sinusitis (473.2); other upper respiratory tract disease (478), vertiginous syndrome and labyrinthine disorder (386.9) and possible eustachian tube disorder (381.8). AR 406. The doctor opined that Plaintiff would benefit from sinus surgery. AR 406.

In February and March 2014, Plaintiff was treated by Thomas B. Bryan, M.D.[6] AR 417-18. Dr. Bryan's records include notes only for the March 2014 examination, which are not fully legible, but indicated that Plaintiff reported "hurting all over" with tender target areas, especially on the right. AR 418. The doctor noted that Plaintiff had been tested for lupus and rheumatoid arthritis. AR 416. Dr Bryan ordered lab tests for sedimentation rate (ESR) and C-reactive protein, both of which subsequently tested in the normal range. AR 416, 418.

In March 2015, optometrist Neil R. Nedeker, O.D., F.A.A.O., examined Plaintiff's vision as a new patient. AR 427-29. Plaintiff reported a decline in vision without glasses, particularly in reading and distance vision. AR 427. Visual examination indicated a healthy macula but OPTOS Retinal Imaging indicated a macular defect. AR 428. Dr. Nedeker diagnosed age-related macular degeneration, hyperopia, astigmatism and presbyopia. AR 428. He directed Plaintiff to take AREDS II eye vitamins, consume leafy green vegetables, wear sunwear/UV protection and regular professional vision monitoring. AR 428. She was to return in one year. AR 428.

On May 7, 2015, Plaintiff scheduled an emergency appointment with Dr. Nedeker, reporting vision loss and blurring occurring two to three times weekly for one-half to three or four hours. AR 441. Noting transient obscurations and vascular insufficiency, Dr. Nedeker referred Plaintiff to a cardiologist. AR 442.

On May 12, 2015, Plaintiff had multiple tests including an echocardiogram. AR 467-71. A carotid ultrasound examination was negative. AR 467. A CT scan of Plaintiff's brain was

---

[6] Medical records provided by Dr. Bryan also indicate that Plaintiff failed to keep appointments in February 2011 and June 2012. AR 418.

6

negative except for a small area of low density within the pituitary gland, possibly a small pituitary cyst or small microadenoma. AR 468.

On July 6, 2015, Mark A. Wagner, D.O., reported a normal stress test. AR 464. On the same day, Plaintiff's primary care physician Satnam S. Uppal, M.D., reported a normal electrocardiogram with no evidence of ischemic heart disease. AR 466.

The record includes notes from twelve of Plaintiff's appointments with Dr. Uppal, all but one of which (January 2015) are undated. AR 452-63. Plaintiff's diagnoses included fibromyalgia, GERD, rash and high blood pressure.[7] Plaintiff consistently reported fibromyalgia and other body pain, and twice reported having visited a hospital emergency room for treatment of pain.

Plaintiff continued treatment with Dr. Nebeker on September 17, 2015. AR 487-94. She complained of blurred vision; dry, scratchy eyes; teary eyes; and, headaches.

The record includes treatment notes of gynecologists Linda Ottemoeller, M.D. (April 2012-January 2016) concerning Plaintiff's complaints of vaginal pain, pelvic pain and urinary tract problems. AR 540-62.

**IV.    Standard of Review**

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted). When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v.*

---

[7] Due to Dr. Uppal's poor handwriting and use of cryptic abbreviations, these records provide little insight into Plaintiff's impairments.

7

*Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and internal quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

### V. The Disability Standard

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 416.920(a)-(f). The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled. 20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform his past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level. 20 C.F.R. § 416.920(a)-(f).

## VI. Summary of the ALJ's Decision

Administrative Law Judge Madsen found that Plaintiff had not engaged in substantial gainful activity from the alleged onset date of June 28, 2011 through her last insured date of December 31, 2015. AR 19. Her severe impairments were fibromyalgia and osteoarthritis of the right knee. AR 19. None of the severe impairments met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). AR 22.

The ALJ concluded that Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b), with occasional kneeling, crouching, crawling and climbing. AR 22. Plaintiff was able to perform her past relevant work as a medical office manager/medical assistant and real estate agent. AR 26. Accordingly, the ALJ found that Plaintiff was not disabled at any time from June 28, 2011, the alleged onset date, through December 31, 2015, the date last insured. AR 26.

## VII. Sufficient Evidence Supported the ALJ's Determination

Plaintiff contends that the determination of Plaintiff's residual functional capacity was not supported by sufficient evidence. The Commissioner disagrees. After careful reviewing the administrative record and the ALJ's analysis, the Court concludes that substantial evidence supported the ALJ's determination of Plaintiff's residual functional capacity.

### A. Medical Opinions

#### 1. Agency Physicians

Plaintiff alleged disability resulting from headaches, fibromyalgia, peripheral neuropathy, stroke, heart problem and hearing loss. AR 62. On April 28, 2015, J. Frankel, M.D., wrote:

> [Claimant] has very few responding sources that do not go back to her AOD [Alleged Onset Date]. The available sources only show a couple of visits and [diagnosis] does not appear to match [symptoms], such as [complained of] dizziness with normal hearing and sinus problems. [Claimant] with AOD of 2011 and only one source goes back that far, for a normal ankle finding.
>
> [Claimant] is with [*sic*] some credibility issues esp[ecially] at CE [consulting examination]: she brings a long laundry list of ailments and then has fairly normal exam. [O]nly findings at CE are mild and consist of a slight decrease in str[ength], r[ight] hand, sl[ightly]

9

> positive SLR [straight leg raising] in supine at 90 deg[rees] with mild pulling. She complained of tenderness in every location touched, including when 'brushed' up against. [T]his reduces credibility. [Claimant] with new [diagnosis] of mac[ular] deg[eneration] but has normal vision currently.

AR 66.

Dr. Frankel opined that Plaintiff had the residual functional capacity to lift fifty pounds occasionally and 25 pounds frequently; to stand and/or walk for six hours in an eight-hour workday; and, to sit six hours in an eight-hour workday. AR 68-69. Plaintiff had no postural, manipulative, visual or communicative limitations. AR 69. She had no environmental limitations except that she should avoid concentrated exposure to unprotected heights. AR 69. On reconsideration, K. Quint, M.D., agreed with Dr. Frankel's opinion. AR 79, 82-83.

Psychologist John Petzelt, Ph.D., noted that although Plaintiff did not allege mental health impairment, medical records indicated that Plaintiff's primary care physician had diagnosed depression and anxiety and prescribed psychotropic medication. AR 80. In addition, Plaintiff alleged memory problems in a letter dated May 20, 2015, but had submitted no evidence of medical evaluation for this complaint. AR 80.

## 2. Consultative Examination: Internal Medicine

Internist Roger Wagner examined Plaintiff on March 19, 2015. AR 430-35. Plaintiff provided a list of her past ailments: cervical cancer status post hysterectomy; right hand surgery; bilateral oophorectomy; appendectomy; nose surgery; right knee surgery x2; right shoulder surgery; left knee surgery; stroke x2; L5-S1 laminectomy; L4-5 and L5-S1 ablations; second back surgery; ankle surgery; Meniere's Disease; macular degeneration; migraines; and, neuropathy. AR 431. Her medications included Norco, Soma,[8] Fioricet,[9] Lyrica,[10] Effexor,[11] Imitrex,[12]

---

[8] Soma (Carisprodol) is a muscle relaxant used with rest, physical therapy and other measures to relax muscles and relieve pain and discomfort caused by sprains, strains and other muscle injuries. www.medlineplus.gov/druginfo/meds/a682578.html (accessed December 2, 2019).

[9] Fioricet, a combination of acetaminophen, butalbital and caffeine, is prescribed to treat migraine headaches. www.medlineplus.gov/druginfo/meds/a601009.html (accessed December 2, 2019).

[10] Lyrica (pregabalin) is prescribed to treat neuropathic pain in the arms, hands, fingers, legs, feet or toes resulting from diabetes and postherpetic neuralgia. www.medlineplus.gov/druginfo/meds/a605045.html (accessed December 2, 2019).

[11] Effexor (venlafaxine) is prescribed to treat depression and generalized anxiety disorder. www.medlineplus.gov/druginfo/meds/a694020.html (accessed December 2, 2019).

[12] Imitrex (sumatriptan) is used to treat the symptoms of migraine headaches.

Zocor,[13] Premarin,[14] Meclizine,[15] Phenergan,[16] Prilosec,[17] Tegretol,[18] Elavil,[19] Trazodone[20] and Benadryl.[21]  AR 431.

Plaintiff stated that she cooked, cleaned, drove, shopped and performed activities of daily living without assistance.  AR 431.  She often walked for exercise.  AR 431.

Plaintiff's examination was generally normal, including her ears, nose and throat.  AR 432-34.  Snellen's test without her glasses revealed 20/25 vision in Plaintiff's left eye and 20/40 vision in the right.  Straight leg raising in the supine position was minimally positive at 90 degrees on the right.  AR 433.  With regard to trigger points, Dr. Wagner wrote, "The claimant complains of tenderness at every spot which I even lightly brushed on her body here today; thus, these are quite nonspecific."  AR 433.

Concerning Plaintiff's two reported strokes, the doctor wrote:

> The claimant had two episodes which might possibly have been transient ischemic attacks.  There was a subtle change in CT scan in the episode in 2009 but she has an essentially non-focal neurologic exam today.

AR 434.

Dr. Wagner found that although Plaintiff had "many of the typical complaints of fibromyalgia, the trigger point testing in his examination was nonspecific.  AR 434.  Finally,

///

---

www.medlineplus.gov/druginfo/meds/a614029.html (accessed December 2, 2019).
[13] Zocor (simvastatin) is prescribed with diet, weight loss and exercise to reduce the chance that heart surgery will be needed in patients who have heart disease or are at risk of developing heart disease. www.medlineplus.gov/druginfo/meds/a692030.html (accessed December 2, 2019).
[14] Premarin (estrogen) is prescribed to treat hot flashes, vaginal dryness and to prevent osteoporosis in postmenopausal women.  www.medlineplus.gov/druginfo/meds/a682922.html (accessed December 2, 2019).
[15] Meclizine is used to prevent and treat nausea, vomiting and dizziness caused by motion sickness. www.medlineplus.gov/druginfo/meds/a682548.html (accessed December 2, 2019).
[16] Phenergan (promethazine) is used to relieve the symptoms of allergic reactions. www.medlineplus.gov/druginfo/meds/a682284.html (accessed December 2, 2019).
[17] Prilosec (omeprazole) is used alone or with other medications to treat the symptoms of gastroesophageal reflux disease (GERD).  www.medlineplus.gov/druginfo/meds/a693050.html (accessed December 2, 2019).
[18] Tegretol (carbamazepine) is used to treat certain types of seizures and trigeminal neuralgia (a condition that causes facial pain).  www.medlineplus.gov/druginfo/meds/a682237.html (accessed December 2, 2019).
[19] Elavil is an anti-depressant.  www.medlineplus.gov/druginfo/meds/a682388.html (accessed December 2, 2019).
[20] Trazodone is an anti-depressant.  www.medlineplus.gov/druginfo/meds/a681038.html (accessed December 2, 2019).
[21] Benadryl (diphenhydramine) is used to relieve symptoms of allergies, to treat motion sickness and to treat insomnia.  www.medlineplus.gov/druginfo/meds/a682539.html (accessed December 2, 2019).

Plaintiff's macular degeneration diagnosis was recent. AR 434. Dr. Wagner's examination indicated that Plaintiff's visual acuity was fairly well retained. AR 434.

Dr. Wagner opined that Plaintiff could lift and carry fifty pounds occasionally and 25 pounds frequently; stand and walk up to six hours in an eight-hour workday; and, sit without limitations. AR 434. Plaintiff had no postural, manipulative or environmental limitations except that she should not work around unprotected heights due to her history of dizziness and Meniere's Disease. AR 435.

### 3. Consultative Psychiatric Examination

On November 19, 2015, neuropsychologist Lance A. Portnoff, Ph.D., conducted a comprehensive psychiatric examination of Plaintiff. AR 480-84. Plaintiff reported a history of mental and physical abuse in her childhood and first marriage. AR 480. She disclosed depression, passive suicidal ideas, intrusive memories, social anxiety/hypervigilance, startle responses and uncued panic attacks that occurred at least once daily and sometime multiple times daily. AR 480-81. Plaintiff denied hallucinations, mania, obsessive-compulsive disorder, counseling or psychiatric hospitalization. AR 481. Plaintiff had the ability and motivation to manage personal hygiene and dressing. AR 482. She could travel alone, manage money and prepare her own food. AR 482. In the course of testing, she demonstrated adequate concentration, persistence and pace. AR 482. Except for some mild to moderate tearful depression and evidence of inadequate social judgment, the results on the mental status examination were normal. AR 482-83.

Dr. Portnoff diagnosed major depressive disorder, single episode, mild to moderate, and post-traumatic stress disorder. AR 483. The doctor opined that Plaintiff's prognosis was fair and depended on continued access and participation in appropriate psychotropic treatment. AR 483.

Functionally, Plaintiff was able to perform simple and repetitive tasks and had no limitations of her ability to perform detailed and complex tasks, or to work on a consistent basis without special or additional instruction due to psychiatric problems. AR 484. Plaintiff had mild limitations on her ability to maintain regular attendance in the workplace from a psychological standpoint. AR 484. Because of Plaintiff's major depressive disorder and post-traumatic stress

syndrome, she had moderate limitations in her ability to interact with coworkers and the public; to complete a workday or work week without interruptions from a psychiatric condition or mood symptoms; and, to deal with the stress encountered in a normal work environment.  AR 484.

### 4. Treating Physician Opinion: Dr. Uppal

Internist Satnam S. Uppal was Plaintiff's primary care physician and had seen her monthly for fifteen years.  AR 419.  On February 19, 2015, Dr. Uppal completed a Residual Functional Capacity Questionnaire (provided by Plaintiff's attorney) on which he opined that Plaintiff was incapable of full-time work on a sustained basis and was likely to miss more than four workdays weekly.  AR 420-21.  AR 419-20.

Plaintiff's diagnoses were fibromyalgia, migraines, depression, cerebral vascular accident, neuropathy and vitamin D deficiency.  AR 419.  Plaintiff's symptoms, which included pain, headaches, nausea, depression and fatigue, constantly prevented Plaintiff from performing simple work-related tasks.  AR 419. Medications caused side effects of dizziness, loss of concentration, drowsiness and nausea.  AR 419.   Plaintiff's prognosis was poor.  AR 419.

In Dr. Uppal's opinion, Plaintiff could sit for fifteen minutes and stand/walk for ten minutes at a time, but was unable to sit, walk or stand in the course of an eight-hour workday.  AR 419.  She could walk about one-half block without experiencing pain or requiring rest.  AR 419.  Plaintiff needed to be able to shift positions at will and would require six or seven unscheduled fifteen-minute breaks in an eight-hour workday.  AR 419.  Plaintiff could occasionally lift less than ten pounds.  AR 420.  She had bilateral limitation to grasping, turning, twisting objects, and fine manipulation for thirty percent of the workday and reaching for ten percent of the workday.  AR 420.

On August 19, 2017, Dr. Uppal prepared a letter "to whom it may concern" summarizing the doctor's treatment of Plaintiff since 2000.  AR 564-65.

### 5. Treating Physician Opinion: Dr. Nedeker

In an undated letter to the state agency, Dr. Nedeker responded to a question concerning Plaintiff's macular degeneration:

///

> From the examination record, I found she has beginning cataracts, with no mention made of macular degeneration. Referencing the fundus photos I took of the back of the eye, I did not find macular degeneration documented or seen in photos. You will note also from the examination that she has corrected vision of 20/30 vision in both the right eye and the left eye. This is consistent with beginning cataracts.
>
> From the examination history, [Plaintiff] reported blurred vision at distance, intermediate and near, reported loss of vision, and times when the vision goes blurry, with incidences increasing. Vision loss lasts ½ hour to three to four hours. She reported she has had two strokes. She reported smoking for 17 or 18 years.
>
> Threshold visual field studies were unremarkable.
>
> Because of her claim that the vision goes blurry for various periods of time, I referred her for consultation with her cardiologist as this may be associated with the same etiology as her strokes.
>
> She was found to be mildly hyperoptic and presbyoptic. The balance of the examination was unremarkable.
>
> My impression is that her vision loss is most likely due to vascular disease and most likely secondary to long-term smoking.

AR 443.

### B.     <u>Determining Residual Functional Capacity</u>

"Residual functional capacity is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p. The residual functional capacity assessment considers only functional limitations and restrictions which result from an individual's medically determinable impairment or combination of impairments. SSR 96-8p.

A determination of residual functional capacity is not a medical opinion, but a legal decision that is expressly reserved for the Commissioner. See 20 C.F.R. §§ 404.1527(d)(2) (RFC is not a medical opinion), 404.1546(c) (identifying the ALJ as responsible for determining RFC). "[I]t is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity." *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001). In doing so the ALJ must determine credibility, resolve conflicts in medical testimony and resolve evidentiary ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039-40 (9th Cir. 1995).

///

"In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record such as medical records, lay evidence and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins*, 466 F.3d at 883. *See also* 20 C.F.R. § 404.1545(a)(3) (residual functional capacity determined based on all relevant medical and other evidence). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).

The opinions of treating physicians, examining physicians, and non-examining physicians are entitled to varying weight in residual functional capacity determinations. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. *Id.*; *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996). The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990). An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons. *Lester*, 81 F.3d at 831. In contrast, a contradicted opinion of a treating professional may be rejected for "specific and legitimate" reasons. *Id.* at 830. However, the opinions of a treating or examining physician are "not necessarily conclusive as to either the physical condition or the ultimate issue of disability." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999).

### C. The ALJ Properly Analyzed Evidence in the Record as a Whole

"[A]n ALJ is responsible for determining credibility and resolving conflicts in medical testimony." *Magallanes*, 881 F.2d at 750. An ALJ may choose to give more weight to opinions that are more consistent with the evidence in the record. 20 C.F.R. §§ 404.1527(c)(4) ("the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion").

The ALJ's analysis began at step two with careful consideration of the many impairments alleged by Plaintiff and concluded that only two, fibromyalgia and osteoarthritis of the right knee,

were severe. AR 19-22. Because no significant evidence suggested that the other alleged impairments significantly limited Plaintiff's ability to perform basic work activities, those impairments were not severe. AR 20.

Moving on to analyze evidence of Plaintiff's residual functional capacity at step four, the ALJ noted that Plaintiff's disability insurance claim alleged two severe impairments: fibromyalgia and symptoms of peripheral neuropathy. AR 23. Plaintiff's testimony, however, added allegations of right knee pain, a broken foot bone, constant right ankle pain, daily headaches, irritable bowel syndrome, pelvic pain, ringing of the ears, jaw pain, depression, post-traumatic stress syndrome, panic attacks and reclusiveness. AR 23-24

The ALJ concluded that the objective medical evidence did not fully support Plaintiff's allegation that she was unable to perform in a competitive work environment. AR 24. Plaintiff does not challenge the ALJ's determination that her testimony was not fully credible.

The ALJ noted "very limited records dating back to claimant's alleged onset date." AR 25. Treatment notes documented "a couple of visits for her fibromyalgia flare-ups," but physical examination showed nonspecific trigger points. AR 25. Straight leg raising was only slightly decreased. AR 25-26. Except for abnormal findings relating to the right knee, musculoskeletal examinations were consistently negative for joint pain or gait problems. AR 26.

The ALJ gave little weight to Dr. Wagner's opinion that Plaintiff was capable of medium work, finding that it was inconsistent with objective findings and the record as a whole, and failed to recognize evidence of fibromyalgia. AR 25. She also gave only partial weight to the agency physicians, Drs. Frankel and Quint, again because their opinions failed to acknowledge evidence of Plaintiff's fibromyalgia and right knee impairment. The ALJ gave partial weight to Dr. Uppal's opinion but found it overly restrictive and inconsistent with his own treatment notes. AR 25.

"[A]n ALJ is responsible for determining credibility and resolving conflicts in medical testimony." *Magallanes*, 881 F.2d at 750. She properly determines the weight to be given each medical opinion by considering the evidence in the record as the ALJ did here. 20 C.F.R. § 404.1527(c)(4) ("the more consistent an opinion is with the record as a whole, the more weight

we will give to that opinion"). The record must include objective evidence to support the medical opinion of the claimant's residual functional capacity. *Meanel v. Apfel*, 172 F.3d 1111, 1113-14 (9th Cir. 1999). Inconsistencies with the overall record or with a physician's own notes are a valid basis to reject a medical opinion. *Molina v. Astrue*, 674 F.3d 1104, 1111-1112 (9th Cir. 2012) (recognizing that a conflict with treatment notes is a germane reason to reject a treating physician's assistant's opinion); *Connett v. Barnhart,* 340 F.3d 871, 875 (9th Cir. 2003) (rejecting physician's opinion when treatment notes provide no basis for the opined functional restrictions); *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (incongruity between questionnaire responses and the Plaintiff's medical records is a specific and legitimate reason for rejecting an opinion); *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 692-693 (9th Cir. 2009) (holding that a conflict with treatment notes is a specific and legitimate reason to reject a treating physician's opinion).

The Court is not required to accept Plaintiff's characterization of her treatment records. The ALJ fully supported her determination based on multiple medical and psychological opinions and the evidence of record.

Even if this Court were to accept that the record could support Plaintiff's opinion, the record amply supports the ALJ's interpretation as well. When the evidence could arguably support two interpretations, the Court may not substitute its judgment for that of the Commissioner. *Jamerson*, 112 F.3d at 1066.

**VIII. <u>No Further Development of Record Was Required</u>**

In the course of Plaintiff's contention that the determination of her residual functional capacity was not supported by substantial evidence, Plaintiff contends that the ALJ should have further developed the record, particularly of her mental health impairments. The Commissioner counters that the record showed no more than mild mental health problems which were conservatively treated with medication prescribed by Plaintiff's primary care physician.

A claimant generally bears the burden of proving his or her entitlement to disability benefits. *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001); 20 C.F.R § 404.1512(c). But Social Security hearings are not adversarial proceedings. *DeLorme v. Sullivan*, 924 F.2d 841, 849

17

(9th Cir. 1991). Whether or not the claimant is represented by counsel, the ALJ "must inform himself about the facts relevant to his decision." *Heckler v. Campbell*, 461 U.S. 458, 471 n. 1 (1983). "The ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983). *Accord Tonapetyan*, 242 F.3d at 1150; *Smolen*, 80 F.3d at 1288. Such further development occurred in this case following the Commissioner's targeted denial, which resulted in supplementation of the record, including Dr. Portnoff's consultative psychiatric examination.

In any event, the ALJ's obligation to obtain additional evidence is triggered only when the evidence from the treating medical source is inadequate to determine the claimant's disability. *Thomas*, 278 F.3d at 958; *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) (holding that ALJs have a duty fully and fairly to develop the record when the evidence is ambiguous or "the record is inadequate" to allow for proper evaluation of the evidence). When the ALJ finds support in the record adequate to determine the claimant's disability, she is not required to secure an additional or consultative opinion. *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005).

### IX. Constitutionality of ALJ's Appointment

Plaintiff contends that even if the Court were to decide the alleged errors in the Commissioner's favor, the Court would have to remand the case for rehearing because the ALJ was unconstitutionally appointed. She bases her argument on *Lucia v. Securities and Exchange Comm'n*, 138 S.Ct. 2044 (2018), which held that "only the President, a court of law, or a head of a department" can appoint inferior officers within the meaning of the Appointments Clause. *Id.* at 2051. The Commissioner disagrees, emphasizing that Plaintiff never argued that the ALJ was unconstitutionally appointed at any point in the administrative process. This Court agrees.

"'[O]ne who makes a timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case' is entitled to relief." *Id.* at 2055 (quoting *Ryder v. United States*, 515 U.S. 177, 182-83 (1995)). In the case cited above, Mr. Lucia was entitled to relief because he "made just such a timely challenge." *Lucia*, 138 S.Ct at 2055. Having failed to timely challenge the ALJ's appointment, Plaintiff is not entitled to constitutional relief. *See, e.g.,*
///

*Byrd v. Berryhill*, 2019 WL 95461 at * 6, n. 10 (E.D. Cal. Jan. 03, 2019) (No. 1:17-cv-01619-SKO), and the cases cited therein.

### X.     **Conclusion and Order**

Based on the foregoing, the Court finds that the ALJ's decision that Plaintiff is not disabled is supported by substantial evidence in the record as a whole and is based on proper legal standards.  Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of Court is directed to enter judgment in favor of Defendant Andrew Saul, Commissioner of Social Security, and against Plaintiff Susan Laura Erb.

IT IS SO ORDERED.

Dated:     **December 5, 2019**                              **/s/ Gary S. Austin**
                                                                            UNITED STATES MAGISTRATE JUDGE